TRAVIS F. CHANCE, ESQ., Nevada Bar No. 13800
tchance@bhfs.com
BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, Nevada 89106
Telephone: 702.382.2101
Facsimile: 702.382.8135

SEAN S. CUFF, ESQ. (*pro hac vice*)
scuff@bhfs.com
BROWNSTEIN HYATT FARBER SCHRECK, LLP
675 15th Street, Suite 2900
Denver, CO 80202
Telephone: 303.223.1100

*Attorneys for Plaintiff Daniel Petersen*

BROWNSTEIN HYATT FARBER SCHRECK, LLP
Attorneys at Law
100 North City Parkway, Suite 1600
Las Vegas, Nevada 89106

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

DANIEL PETERSEN,

Plaintiff,

v.

KELLY MILLS EVERS,

Defendant.

CASE NO. 3:26-cv-00094-ART-CSD

**FIRST AMENDED COMPLAINT FOR LIBEL AND SLANDER PER SE**

**AND**

**DEMAND FOR JURY TRIAL**

Plaintiff DANIEL PETERSEN ("**Mr. Petersen**"), by and through his counsel of record, the law firm of Brownstein Hyatt Farber Schreck, LLP, submits his First Amended Complaint for Libel and Slander Per Se against Defendant KELLY MILLS EVERS ("**Defendant**"), alleging as follows:

## INTRODUCTION

This case concerns false and defamatory statements lodged against Mr. Petersen, a concerned property owner who became the center of Defendant's vendetta against him. That vendetta began when Mr. Petersen raised legitimate concerns about Defendant's fiduciary shortcomings and mismanagement as the board President of the Coeur du Lac Condominium Homeowners Association ("**CDL**"), where Mr. Petersen owns a unit.

In the summer of 2024, Defendant, then-CDL board President, informed CDL unit owners that CDL's insurer declined renewal of the association's policy, purportedly because of wildfire risks, and that the anticipated premium for replacement insurance would likely be significant and

BROWNSTEIN HYATT FARBER SCHRECK, LLP
Attorneys at Law
100 North City Parkway, Suite 1600
Las Vegas, Nevada 89106

require increases in dues and the issuance of assessments. Mr. Petersen and his wife have clients in their business that include some of the nation's top insurers. So in an attempt to assist the board in finding affordable replacement coverage, they shared those contacts with members of the CDL board. After receiving no response from the board member handling the insurance issues, and with the encouragement of another board member, they worked directly with one of their top insurance contacts and were ultimately referred to a local Nevada agent by their contact.

That agent expressed difficulties in obtaining CDL's loss run reports, which contain information necessary for an insurer to provide a quote, so Mr. Petersen secured those reports from CDL's current insurer and its insurer before that one. Those reports disclosed that a previous property damage claim was made by a unit owner, a claim that never should have been made on CDL's policy and instead should have been made on the unit owner's individual policy. But that claim was never disclosed to owners – including Mr. Petersen – by Defendant and Defendant improperly allowed the claim to be made on CDL's policy.

As a result of that and Defendant's other fiduciary shortcomings, Mr. Petersen made a statutorily compliant petition to recall Defendant from the board, supported by the requisite number of unit owners. Mr. Petersen's exercise of his free speech and statutorily protected rights was apparently too much for Defendant and became her breaking point.

But even before the recall petition was circulated, Defendant began her campaign of defamation. On October 21, 2024, in a written communication to CDL's insurer, Defendant accused Mr. Petersen of committing a category B felony by fraudulently misrepresenting himself to obtain CDL's policy-related data. Defendant made that accusation despite having received a letter from Mr. Petersen just 17 days earlier expressly denying any misrepresentation of his status, and despite AFI's own internal records identifying him as a "Homeowner." Defendant demanded that AFI's legal and compliance departments investigate and report Mr. Petersen to the authorities—a baseless request designed to tarnish Mr. Petersen's reputation and intimidate him into silence, should such an investigation be conducted.

Six months later, at an open board meeting where Defendant was given her own agenda item to respond to the recall petition, she escalated her defamatory assault. Rather than legitimately

address the concerns underlying Mr. Petersen's recall effort, Defendant went "all in" on a defamatory tirade. She displayed Nevada's insurance fraud statute and, in front of the assembled unit owners, declared that Mr. Petersen had committed felony insurance fraud by making insurance applications on behalf of CDL that intentionally omitted material facts—applications that Mr. Petersen never made. Defendant knew this accusation was false: Mr. Petersen had merely obtained a quote at a previous CDL insurer's repeated invitation; he never submitted any applications, never misrepresented his board status, and could not have omitted information the insurer never asked for and already believed it had in its own historical records.

Defendant's accusations went far beyond any legitimate discourse on her impending recall. No common-interest community owner should face written and spoken accusations of felony criminal conduct in retaliation for simply trying to protect the best interests of that community. Mr. Petersen thus brings this action to vindicate his good name and reputation.

BROWNSTEIN HYATT FARBER SCHRECK, LLP
Attorneys at Law
100 North City Parkway, Suite 1600
Las Vegas, Nevada 89106

**PARTIES**

1. Mr. Petersen, an individual, is a citizen of Idaho.

2. Defendant, an individual, is a citizen of California or was a citizen of California at the time this action was filed and, in any event, is not a citizen of Idaho.

**JURISDICTION AND VENUE**

3. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332. There is complete diversity between the parties. Moreover, this is an action for slander per se and libel seeking, among other things, presumed damages and so the amount in controversy exceeds $75,000.

4. At the time of the defamatory statements described herein, Mr. Petersen was a resident of Washoe County, Nevada. Defendant is therefore subject to specific personal jurisdiction in Nevada because: (i) she expressly directed her intentional conduct at Nevada and caused harm she knew would be, and intended to be, suffered in Nevada; and (ii) Defendant's wrongful conduct arose out of her position as President of the CDL board, a position she could only hold by owning real property within CDL.

5. Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the Complaint occurred in Nevada.

6. Under LR IA 1-6, this action is properly assigned to the unofficial Northern Division because that is where the conduct giving rise to Mr. Petersen's claims originated and where the harm was felt.

## GENERAL ALLEGATIONS

### *The Coeur du Lac Condominium Homeowners Association And A 2023 Water Damage Claim On It Insurance Policy*

7. CDL is a small common-interest community that consists of 58 condominium units and is located in Incline Village, Nevada.

8. Defendant Evers served as the President of the CDL board from July 2023 to April 2025.

9. On July 26, 2023, a unit owner submitted a claim on CDL's insurance policy related to water damage to that owner's unit that also damaged the unit below it.

10. Upon information and belief, Defendant, as CDL President, did not prevent that claim to be submitted to and paid by CDL's insurer, American Family Insurance ("**AFI**"), when it should have been submitted to and paid by the unit owner's insurer because it fell outside the scope of property covered by CDL's policy, irrespective of the legal ability of AFI to subrogate against the unit owner's policy.

11. And while Defendant claims that AFI told her CDL's policy "provided coverage" for the water damage claim, Defendant, as CDL's president, still allowed the claim to be placed on CDL's policy rather than the unit owner's.

### *Non-Renewal Of CDL's Insurance Policy In 2024*

12. Because of the negligent unit owner's claim on CDL's policy and for unrelated wildfire risk concerns, AFI issued a non-renewal notice for CDL's policy sometime around the summer of 2024, effective October 31, 2024.

13. Shortly after learning of the non-renewal and realizing how the water damage claim jeopardized CDL's insurance coverage, Defendant demanded on September 19, 2024, that AFI remove the water damage claim from CDL's claims history.





BROWNSTEIN HYATT FARBER SCHRECK, LLP
Attorneys at Law
100 North City Parkway, Suite 1600
Las Vegas, Nevada 89106

14. Defendant expressly stated that "CDL was in no way at fault for any of the events that led to the water damage claim."

15. There would have been no basis for making this demand if the water damage claim had, in fact, been properly placed on CDL's policy in the first place.

16. And this demand demonstrates Defendant's attempt to erase the documentary record of the water damage claim from CDL's claims history – that is, her attempts to conceal it.

17. Defendant, as CDL board President, issued community-wide letters in July and September 2024, disclosing that notice, estimating that replacement insurance premiums would likely increase upwards of 10-fold, from $48,000 to $480,000 per year, and indicating that such an increase would necessarily require assessments from unit owners.

18. As the termination date for AFI's coverage grew nearer and without any confirmed replacement coverage, Mr. Petersen and his wife, Sharon Petersen ("**Mrs. Petersen**"), grew understandably concerned that all unit owners would be stuck paying for an exorbitant increase in insurance premium.

19. In late August/early September 2024, the Petersens, who through their business work with top commercial insurance agents nationwide, informed then-board member Rob Penrose of those contacts. Mr. Penrose directed them to share those contacts with board member Kim Lighthart so that the board could engage them for purposes of avoiding a lapse in insurance, find other coverage options for CDL, and prevent imposing extreme assessments and dues increases on all unit owners.

20. After forwarding those contacts, Ms. Lighthart did not respond. Given that, Mrs. Petersen told Mr. Penrose and offered to reach out directly for a quote if she could get it and if so, would forward it to the board. Mr. Penrose encouraged her to do so.

21. Mrs. Petersen contacted one of her top insurance industry contacts who referred her to a broker. When attempting to prepare a quote, the broker was unable to obtain a report of claims made on prior CDL policies (so called "loss-run reports"), critical documents for CDL to have in order to obtain competitive quotes because they detail its claims history.

BROWNSTEIN HYATT FARBER SCHRECK, LLP
Attorneys at Law
100 North City Parkway, Suite 1600
Las Vegas, Nevada 89106

22. So on or around September 5, 2024, Mr. Petersen first communicated with CDL's then-current insurer AFI and obtained AFI's loss-run report.

23. At no time did Mr. Petersen represent that he was on CDL's board in order to obtain that report. Indeed, a September 5, 2024, AFI internal email documenting Mr. Petersen's call to AFI to request the report identifies him explicitly as "Dan Petersen Homeowner"—not as a board member. No AFI internal communication identifies Mr. Petersen as anything other than a homeowner.

24. Because CDL would need more than the two years of claims history shown on AFI's report, Mr. Petersen contacted the CDL insurer before AFI, Menath Insurance ("**Menath**"), to obtain its loss-run report in the days that followed his call to AFI.

25. Mr. Petersen identified himself to the Menath employee with which he initially dealt, Lori Nelson ("**Nelson**"), as a CDL homeowner.

26. In that initial conversation, Nelson asked to provide a quote for replacement coverage. Mr. Petersen declined.

27. Mr. Petersen later followed up with Nelson on the status of the loss-run report and she asked to quote a second time. Mr. Petersen did not object but he never represented himself as any authorized agent of the board. He conveyed that the quote provided would be forwarded to the CDL board for further handling and consideration.

28. Ron Wright, a Producer and Director at Menath who handled the CDL account ("**Wright**"), did not initially speak with Mr. Petersen about CDL's loss-run reports. Instead, he first spoke with Nelson about them. After Mr. Petersen finally acquiesced to Nelson's many requests to quote, he was passed to Wright for further handling.

29. Wright had worked with CDL and Community Association Underwriters ("**CAU**") for almost twenty years. Through that working history, Menath obtained and compiled extensive historical data about CDL for insurance coverage purposes, including data derived from property inspections conducted by CAU approximately every three years.

30. Wright asked Mr. Petersen for certain information that he needed for purposes of quoting and Mr. Petersen provided truthful information in response.





BROWNSTEIN HYATT FARBER SCHRECK, LLP
Attorneys at Law
100 North City Parkway, Suite 1600
Las Vegas, Nevada 89106

31. Days before the October 31, 2024, termination date of the AFI policy, Menath sent Mr. Petersen its quote and told him that other forms and documents would need to be filled out if CDL wanted to submit an application. Mr. Petersen sent that quote – the only one the Petersens ever obtained – to the CDL board.

32. Wright testified that he thought Mr. Petersen was forthcoming and truthful in their communications.

33. In other words, when Wright asked Mr. Petersen for information, Mr. Petersen provided truthful information in response.

34. With respect to CDL's aluminum wiring, Wright testified:

a. Over the course of their interactions, Wright does not recall ever asking Mr. Petersen for information about CDL's wiring.

b. Wright does not believe he asked for such information because he already had that information from CAU and its historical relationship with CDL.

c. Based on approximately half a dozen inspections conducted over twenty years, Wright expected the information on wiring that he had—which indicated CDL's wiring was copper—to be correct.

35. Thus, Mr. Petersen could not have "intentionally omitted" information about aluminum wiring that he was never asked to provide and that Menath believed it already possessed from its own independent sources.

36. Nelson likewise testified, as to CDL's wiring, that during her work with CDL from 2014 through 2021—spanning nearly seven years of handling CDL's insurance account—she never learned that CDL had aluminum wiring in its subpanels.

37. With respect to Mr. Petersen's alleged representations that he was on the CDL board, Wright testified that:

a. He could not recall whether Mr. Petersen represented himself as being on the CDL board.

b. Mr. Petersen's status on the board would not have impacted the CDL quote.

BROWNSTEIN HYATT FARBER SCHRECK, LLP
Attorneys at Law
100 North City Parkway, Suite 1600
Las Vegas, Nevada 89106

BROWNSTEIN HYATT FARBER SCHRECK, LLP
Attorneys at Law
100 North City Parkway, Suite 1600
Las Vegas, Nevada 89106

c. He himself may have referred to Mr. Petersen as "board president" in an email to a carrier as a tactic Wright often employed to impress urgency on carriers and get a quicker response.

38. Nelson similarly testified regarding Mr. Petersen's alleged representations that she does not recall ever speaking to Mr. Petersen or Defendant, whether Mr. Petersen represented himself as a board member, and agreed there may have been a "miscommunication" regarding whether she thought Mr. Petersen was on CDL's board.

39. Defendant, in the meantime, obtained an insurance quote of her own from one of her preferred insurance brokers based in California where she lives, Alliant Insurance Services.

40. Through her role as CDL board president, Defendant engaged Alliant as CDL's broker of record. In doing so, however, Defendant worked to steer any legitimate quotes prepared by other brokers, such as a Menath, to Alliant.

41. After the Menath quote was provided to the CDL board, the Alliant quote obtained by Defendant materially changed in that its premium decreased by tens of thousands of dollars and added cyber liability coverage (a requirement under Nevada law) that was included in Menath's quote but not Alliant's original one. Alliant took credit for a quote from Kinsale that was obtained by Wright. In other words, Defendant relied on the Menath quote and submitted it to Alliant in order to obtain a revised Alliant quote.

42. Ultimately, the board approved the Alliant quote. Alliant picked up coverage with conditions, providing CDL around 30 days to remediate aluminum wiring in certain of its subpanels (because of fire hazards/risks). And though it was initially prepared by Menath and Wright, Kinsale also allowed remediation before binding coverage for CDL.

43. In all interactions with insurance companies, agents, and brokers, neither Mr. Petersen nor Mrs. Petersen ever submitted any applications for insurance on behalf of CDL or any papers that might be construed as an application; did not present themselves as a CDL board member; did not fill out any paperwork relative to an insurance application, including after receipt of Menath's quote; and all third parties knew the Petersens were not board members and any quotes provided would be forwarded to the board for review and handling.

44. And Defendant knew all of those facts. In an October 4, 2024 letter to Defendant, Mr. Petersen expressly informed her:

> There is nothing in this statement that assumed actual or apparent authority to act on the behalf of the CDL HOA Board. Mrs. Petersen would have turned over all of our Agent's contact information to Kim Lighthart, but she received no response. We have not and will not be signing contracts, agreements or policies with any Insurance Carrier Agent or a Broker, we are only obtaining free, no strings attached quotes from our contacts in attempt to lessen the cost burden for all CDL Owners.

Thus, months before the April 18, 2025, board meeting, Defendant had direct written notice from Mr. Petersen that he was not acting with board authority, or representing to anyone that he was, and was not submitting any insurance applications for CDL.

45. Mr. Petersen's October 4, 2024, letter further stated that CDL owners are free to contact insurers and that he was acting solely to obtain "free, no strings attached" quotes to benefit all owners—establishing his good-faith motive and directly undercutting any characterization of his conduct as fraudulent or retaliatory.

46. Wright himself has confirmed these facts.

47. Wright testified that:

a. Applications for insurance are different from quotes, that a quote is fundamentally different from an application, and Mr. Petersen obtained only the former.

b. Mr. Petersen never filled out an insurance application or statement of value for Menath's use in the fall of 2024.

c. Mr. Petersen never signed an Acord insurance application and never bound CDL to the Menath quote..

48. After the Menath quote was transmitted to the Board, CDL's property management company, Incline Property Management ("**IPM**"), emailed Wright on October 28, 2024, asking to see "the applications Dan Petersen filled out for this quote." No such applications were ever given to IPM because none existed since Mr. Petersen never filled out any.





BROWNSTEIN HYATT FARBER SCHRECK, LLP
Attorneys at Law
100 North City Parkway, Suite 1600
Las Vegas, Nevada 89106

49. Outside of asking about short-term rentals, circuit breakers, the recent water damage claim, and CDL's operating and reserve budget, Wright does not recall asking Mr. Petersen for any additional information for quotes.

***When Mr. Petersen Begins To Openly Question Defendant's Performance As Board President, She Retaliates By Accusing Him Of Criminal Fraud And Deceit***

50. After reviewing AFI's loss-run report, Mr. Petersen believed that Defendant allowed a unit owner to make a claim related to water damage on the AFI policy, which severely impaired CDL's ability to obtain insurance coverage, especially given the wildfire risk issue. But Defendant never disclosed that fact to the CDL unit owners.

51. Indeed, while the general water damage incident was discussed at a September 23, 2023, CDL board meeting, the meeting minutes reflect that, at the time, the claim was still not resolved. It was certainly never disclosed at that meeting that the water damage incident could place a ***$74,200*** claim on CDL's policy and jeopardize its coverage with AFI in the future.

52. Concerned for CDL's ability to obtain affordable insurance coverage in light of those facts, Mr. Petersen rightfully and legitimately attempted to question Defendant's conduct in handling the HOA's insurance issues at CDL's September 29, 2024, board meeting, but he was purposely muted during it.

53. As a result, Mr. Petersen sent a letter to Defendant and the rest of the board, laying out his concerns about how the unit owner's claim was handled and posing questions about the Alliant quote.

54. On October 20, 2024, Mr. Petersen issued a letter to all unit owners expressing his concerns related to the negligent unit owner's claim, particularly his disappointment of the claim not being properly disclosed to unit owners, its true effect on all unit owners' insurance premiums, Defendant's lack of transparency, and her subpar efforts in properly addressing this issue.

55. The October 20, 2024, letter articulated the exact same position as to CDL's lack of responsibility for the water damage claim as Defendant set out in her demand to AFI just a month earlier.





BROWNSTEIN HYATT FARBER SCHRECK, LLP
Attorneys at Law
100 North City Parkway, Suite 1600
Las Vegas, Nevada 89106

56. On October 21, 2024, Emily Fralick of IPM emailed Defendant with a list of action items in response to Mr. Petersen's October 20 letter, including to "[d]etermine how Dan Petersen obtained the AmFam information" and to schedule board member training and an executive session with the HOA attorney.

57. Less than one hour later—and just 17 days after receiving Mr. Petersen's October 4 letter expressly denying any claim of board authority—Defendant sent a written email to Brett Charbonneau and Nadji Backus of AFI, and copying Emily Fralick, and attaching the October 20 letter with the subject line "Request for Investigation by Compliance Department and Legal Department at American Families."

58. In that email, Defendant stated:

> It is my understanding that in Nevada, misrepresenting yourself as a member of a homeowners' association (HOA) board to obtain information under false pretenses could potentially be illegal. Specifically, this type of behavior may fall under fraud or identity misrepresentation depending on the details, particularly if it was done to gain confidential information. Nevada Revised Statutes (NRS) include laws against fraud and misrepresentation, which could apply here, particularly under NRS 205.377 for 'obtaining information under false pretenses.

59. Defendant further requested that AFI "report and forward the letter by Mr. Petersen to your compliance and legal departments" and investigate whether further actions should be taken, including "filing a claim against the homeowner or reporting the issue to authorities."

60. Overall and in context, Defendant's October 21, 2024, email created the false and defamatory implication that Mr. Petersen committed a category B felony for fraud and deceit because he could only have obtained the AFI loss-runs by lying about his status as a CDL board member ("**Defamatory Statement 1**").

61. Defendant created that implication by transmitting to AFI — the very insurer from whom Mr. Petersen had obtained CDL's loss-run report — Mr. Petersen's October 20, 2024, letter to CDL homeowners, in which Mr. Petersen described his efforts to obtain loss-run reports from AFI. Mr. Petersen's letter disclosed that conduct openly and without any admission of fraud, misrepresentation, or concealment; he described contacting AFI to obtain claims history. The letter contains no statement — express or implied — that Mr. Petersen misrepresented his identity,

BROWNSTEIN HYATT FARBER SCHRECK, LLP
Attorneys at Law
100 North City Parkway, Suite 1600
Las Vegas, Nevada 89106

BROWNSTEIN HYATT FARBER SCHRECK, LLP
Attorneys at Law
100 North City Parkway, Suite 1600
Las Vegas, Nevada 89106

authority, or board affiliation to AFI or to any other insurer or broker in order to obtain AFI's loss-runs.

62. Despite the absence of any disclosed facts supporting an accusation of criminal conduct, Defendant paired Mr. Petersen's letter with a citation to NRS 205.377 and accused Mr. Petersen of committing a Category B felony — pattern fraud through false representation or omission of a material fact. That statute, by its terms, requires "fraud or deceit . . . by means of a false representation or omission of a material fact" that the actor "knows to be false or omitted" and that is undertaken "knowingly and with the intent to defraud."

63. The only way a reader — and in particular an insurance-professional reader at AFI familiar with the protocols governing the release of policyholder loss-run data — could reconcile Mr. Petersen's disclosed conduct with Defendant's accusation of criminal fraud is by inferring undisclosed defamatory facts: namely, that Mr. Petersen must have made false representations to AFI about his identity or authority in order to obtain loss-run reports he was not otherwise entitled to receive, and that he did so knowingly, with fraudulent intent, as part of a pattern of deceit.

64. Defendant's pairing of the facts in Mr. Petersen's letter with an accusation under NRS 205.377, to an insurance industry professional, and demanding that AFI's legal and compliance department undertake a review and report the conduct to authorities as appropriate, necessarily and deliberately implied the existence of additional, undisclosed facts that are themselves false and defamatory.

65. Defamatory Statement 1 is false. No document in the record—including any of AFI's internal communication—reflects that Mr. Petersen lied to AFI that he was a board member in order to obtain information.

66. Just the contrary, AFI's own contemporaneous records identify him as a homeowner.

67. Defendant knew Defamatory Statement 1 was false when she made it. She knew it was false because: (i) she had already seen AFI's contemporaneous records and emails saying Mr. Petersen was a homeowner; and (ii) Mr. Petersen's October 4, 2024 letter, which Defendant had received before making Defamatory Statement 1, expressly stated: "Mrs. Petersen and I have never

made claims to any of the Adjusters, Carriers, Agents, etc. that we have been in contact with, that we were in fact Members of the CDL HOA Board."

***Defendant's Defamatory Assault Against Mr. Petersen At An Open HOA Meeting***

68. On April 5, 2025, Mr. Petersen obtained the requisite number of unit-owner signatures and submitted a petition seeking Defendant's recall as CDL President, having lost trust and confidence in her performance and fitness to serve in that role.

69. On April 18, 2025, CDL held a board meeting open to the owners, which included agenda items for discussing the insurance coverage problems confronting CDL and for Defendant to respond to the recall petition.

70. Rather than address the recall petition legitimately and in a professional manner in her capacity as board President, Defendant decided to use that time to defame Mr. Petersen.

71. During her near hour-long diatribe, Defendant displayed a PowerPoint slide that set out the text of NRS 686A.2815(1)(a), one of the definitions of insurance fraud:

> 1. "Insurance fraud" means knowingly and willfully: (a) Presenting or causing to be presented any statement to an insurer, a reinsurer, a producer, a broker or any agent thereof, if the person who presents or causes the presentation of the statement knows that the statement conceals or omits facts, or contains false or misleading information concerning any fact material to an application for the issuance of a policy of insurance.

72. Defendant then cloaked herself with the authority of judge and jury, declaring:

> Petersen's intentional omission of the material facts to the Menath agent (a) that we had aluminum wiring in the subpanels that he didn't disclose and/or (b) that he was not acting on behalf of the board, in my opinion, constitutes insurance fraud.
>
> In making applications, the applicant has to perform due diligence and disclose all relevant material facts to the insurer. He did not.
>
> This is huge – had the board relied on Petersen's false quote and later suffered a loss, say a fire, the impact to our community would have been disastrous. Every insurance claim made under the HOA master policy would have been denied. The insurance company would have returned our premium, leaving CDL uninsured and devastated. This would have been a catastrophic uncovered loss and each of us would end up with less than $2000 to rebuild a complex that is valued in the range of $25 million under the master policy. Let that sink in for a moment.



BROWNSTEIN HYATT FARBER SCHRECK, LLP
Attorneys at Law
100 North City Parkway, Suite 1600
Las Vegas, Nevada 89106

BROWNSTEIN HYATT FARBER SCHRECK, LLP
Attorneys at Law
100 North City Parkway, Suite 1600
Las Vegas, Nevada 89106

("**Defamatory Statement 2**").

73. Viewed as a whole and in context, the Defamatory Statement 2 conveyed the false and defamatory message that Mr. Petersen committed insurance fraud by knowingly making applications for insurance to Menath on behalf of CDL based on false, omitted, and misleading information – i.e., by knowingly failing to disclose that CDL has aluminum wiring in subpanels and that he was not acting on behalf of the board in doing so, facts that would be material to any such application.

74. Indeed, during the parts of her speech before and after the Defamatory Statement 2, Defendant discussed the insurance fiasco and Mr. Petersen's involvement with it, reinforcing that in context, Defendant was accusing Mr. Petersen of applying for insurance on behalf of CDL based on fraudulent information.

75. That Defendant's defamatory speech conveyed that false message is confirmed by the fact that another board member expressed discomfort in accusing a unit owner—Mr. Petersen—of insurance fraud, as Defendant had just done.

76. Board member Elyse Resnick wrote after the meeting that she was "extremely disturbed" by the situation and that "due to Kelly being the president I was not aware we were able to or supposed to stop her from speaking."

77. Following the April 18, 2025, board meeting, the Nevada Real Estate Division ("**NRED**") initiated proceedings against Defendant, Case No. 2025-526. The Nevada Commission for Common-Interest Communities and Condominium Hotels found, by a preponderance of the evidence, that Defendant willfully and knowingly violated the confidentiality provisions of NRS 116.3103 and NAC 116.405(4) by naming Mr. Petersen at the April 2025 board meeting, and ordered Defendant to pay a $500 administrative fine.

78. NRED's finding confirms that Defendant's conduct at the board meeting was not merely improper but violated Nevada law governing common-interest community administration. The timing of Defamatory Statement 2—made during Defendant's response to Mr. Petersen's recall petition approximately six months after CDL had already obtained replacement insurance coverage

through Alliant—demonstrates that the statement was motivated by personal animus and retaliation, not by any legitimate concern for the CDL community.

79. Further proving her knowledge that Defamatory Statement 2 was wrongful and unjustified before she said it, Defendant initially resigned from the CDL board effective April 30, 2025, but subsequently accelerated her resignation to be effective immediately.

80. Defamatory Statement 2 is a false statement of fact because Mr. Petersen never submitted or made any applications for insurance to Menath, was never engaging with Menath to do so, and never represented himself as any authorized agent of the board.

81. Instead, Mr. Petersen merely obtained a loss-run report from Menath to help the board secure alternative insurance quotes and mitigate an almost tenfold increase in insurance costs to be borne by all unit owners.

82. Defamatory Statement 2 was also false because it was Menath that offered to provide a quote to Mr. Petersen based on information it already had from nearly twenty years of insuring CDL through CAU, including approximately half a dozen independent property inspections—all of which indicated CDL's wiring was copper. Wright relied on this historical data and did not ask Mr. Petersen about CDL's wiring. Mr. Petersen could not have "intentionally omitted" information about aluminum wiring from an agent who never asked for it and whose own data indicated the wiring was copper. Nor could Mr. Petersen have known the materiality of the type of wiring when he was never asked about that fact to begin with. Further, Menath at all times knew that Mr. Petersen was not on the board and that any quotes would be provided to the board for handling and review. Thus, no part of Defamatory Statement 2 is even close to true.

83. Wright's deposition testimony further confirms the falsity of Defamatory Statement 2.

84. Wright testified that Menath had compiled historical data about CDL from nearly twenty years of working with the property through CAU, including property inspections conducted approximately every three years—about half a dozen inspections over that period. Menath's own data, derived from these independent inspections, indicated that CDL's wiring was copper. Wright

BROWNSTEIN HYATT FARBER SCHRECK, LLP
Attorneys at Law
100 North City Parkway, Suite 1600
Las Vegas, Nevada 89106

BROWNSTEIN HYATT FARBER SCHRECK, LLP
Attorneys at Law
100 North City Parkway, Suite 1600
Las Vegas, Nevada 89106

did not ask Mr. Petersen about wiring because he relied on that historical data and inspections from CAU.

85. Mr. Petersen could not have intentionally withheld a fact that he was never asked about.

86. Wright also specifically disagreed with Defendant's characterization of the Menath quote as "false," testifying instead that "it's not that it was a false quote—it was a quote that was disqualified after we found out about the aluminum wiring." Wright further disagreed that had CDL bound the Menath quote and suffered a fire loss, the insurer would have necessarily denied coverage, testifying that he has seen carriers pay claims even where the insured had misrepresented wiring type, and that "it's not 100 percent certain that they would" deny coverage.

87. And even after learning on October 28, 2024, that Petersen lacked board authorization, Wright testified: "I still don't know that he was giving me incorrect information. I just don't know that he … didn't tell us that he wasn't authorized to get a quote." Wright thus drew a clear distinction between lacking authorization and engaging in fraud or deception — the very distinction Defendant deliberately collapsed when she accused Mr. Petersen of committing a felony in Defamatory Statement 2.

88. Wright further testified that he believes CDL used a quote he obtained through Kinsale, but the broker of record—Alliant—was given credit for it. Notably, Kinsale allowed for remediation before the policy became binding, directly contradicting Defendant's assertion that reliance on the Menath quote would have been catastrophic.

89. Defendant also believed that, because Alliant was CDL's broker of record, CDL could not consider quotes submitted by other brokers. But as Wright testified, that is not correct.

90. Regardless, Defendant actively undermined valid quotes prepared by Menath. Indeed, Defendant labeled Menath's quotes as "false" and claimed that Wright "circumvent[ed] the rules" by submitting quotes when CDL had a different broker of record. In doing so, Defendant limited CDL's ability to test the insurance market for the best possible rates and coverage.

91. Mr. Petersen brings this action to hold Defendant accountable for her malicious, false, defamatory attacks and to vindicate his reputation.

BROWNSTEIN HYATT FARBER SCHRECK, LLP
Attorneys at Law
100 North City Parkway, Suite 1600
Las Vegas, Nevada 89106

**FIRST CLAIM FOR RELIEF**
**(Libel – Defamatory Statement 1)**

92. Overall and in context, Defamatory Statement 1 falsely implies undisclosed defamatory facts – that Mr. Petersen committed a category B felony for fraud and deceit because he could only have obtained the AFI loss-runs by lying about his status as a CDL board member.

93. Defamatory Statement 1 is defamatory because it tends to lower Mr. Petersen's reputation in the estimation of the community.

94. Defamatory Statement 1 is false. At no time did Mr. Petersen represent to AFI that he was a CDL board member. AFI's own internal records identify Mr. Petersen as a homeowner and no AFI document supports the claim that Mr. Petersen misrepresented his identity.

95. Defendant published Defamatory Statement 1 to third parties – AFI and Emily Fralick of IPM.

96. Defendant acted negligently when publishing Defamatory Statement 1 because she failed to act with reasonable care as to whether it was false.

97. Alternatively, and even though Mr. Petersen is not a public figure and Defamatory Statement 1 does not concern a matter of public interest, Defendant nevertheless made it with actual malice. At the time she said Defamatory Statement 1, Defendant:

a. Had received Mr. Petersen's October 4, 2024, letter expressly denying any board misrepresentation.

b. Had received AFI's own internal designation of Mr. Petersen as a "Homeowner," and knew of the absence of any other evidence supporting her accusation.

c. Made Defamatory Statement 1 within approximately one hour of receiving Fralick's action-item email identifying a need to investigate how Mr. Petersen obtained AFI information, a wholly insufficient time to conduct any investigation whatsoever.

98. As a direct and proximate result of Defendant's libel, Mr. Petersen has suffered general damages, including harm to his reputation and emotional harms. Mr. Petersen is entitled to

an award of presumed damages, because Defamatory Statement 1 is libel per se since it accuses him of committing a felony, in an amount exceeding $75,000.

99. Defendant is further liable for all reasonably foreseeable republications of Defamatory Statement 1 by others, if any, including any republications within AFI since she demanded an internal investigation and any republications by Emily Fralick to CDL board members.

100. Defendant's conduct in making Defamatory Statement 1 was willful, wanton, and malicious and done with a conscious disregard for Mr. Petersen's rights. Defendant made the Defamatory Statement for retributive purposes, with an intent to harm Mr. Petersen, and with spite and ill will toward Mr. Petersen. Therefore, an award of punitive and exemplary damages, subject to no statutory cap, against Defendant is both appropriate and necessary to afford Mr. Petersen complete relief.

**SECOND CLAIM FOR RELIEF**
**(Slander Per Se – Defamatory Statement 2)**

101. Overall and in context, Defamatory Statement 2 accuses Mr. Petersen of committing insurance fraud, a Category D felony, by knowingly making applications for insurance to Menath on behalf of CDL based on false, omitted, and misleading information – i.e., by knowingly failing to disclose that CDL has aluminum wiring in subpanels and that he was not acting on behalf of the board in doing so, facts that would be material to any such application.

102. Defamatory Statement 2 is defamatory because it tends to lower Mr. Petersen's reputation in the estimation of the community.

103. Defamatory Statement 2 is a false statement of fact for the reasons already given.

104. Defendant published Defamatory Statement 2 to third parties — the unit owners in attendance at the HOA board meeting — and did so out of spite, ill will, and malice toward Mr. Petersen.

105. Defendant acted negligently when publishing Defamatory Statement 2 because she failed to act with reasonable care as to whether it was false.

BROWNSTEIN HYATT FARBER SCHRECK, LLP
Attorneys at Law
100 North City Parkway, Suite 1600
Las Vegas, Nevada 89106

106. Alternatively, and even though Mr. Petersen is not a public figure and Defamatory Statement 2 does not concern a matter of public interest, Defendant nevertheless made it with actual malice:

a. When she made Defamatory Statement 2, Defendant was the President of the board and had worked on the same insurance renewal issues that were the subject of that statement. She therefore knew Mr. Petersen was not submitting insurance applications on behalf of CDL and that instead, Mr. Petersen had merely forwarded an unsolicited quote from Menath.

b. Multiple other members of the CDL board knew that Mr. Petersen was simply utilizing his contacts to obtain quotes for CDL, not applying for any insurance policies on its behalf, and those board members encouraged assistance from him. Defendant knew that, as she acknowledged as much in an October 3, 2024, letter to Mr. Petersen.

c. Defendant was not party to the conversations between Mr. Petersen and Menath and so had no direct or personal knowledge of what he did or did not say or did or did not represent when she made Defamatory Statement 2.

d. Defendant knew that Menath was CDL's insurer prior to AFI and only a reckless person would believe that Menath, as a prior insurer that had previously gone through extensive due diligence before issuing a policy to CDL, would not have asked Mr. Petersen for whatever other information it deemed material.

e. Most importantly, Defendant ***relied on the Menath quote and submitted it to Alliant so that Alliant could make its quote more inclusive and more competitive.*** If Defendant truly knew, believed, or thought that Mr. Petersen provided materially misleading or false information that resulted in the Menath quote, she would not have relied on it to have Alliant revise its own quote.

BROWNSTEIN HYATT FARBER SCHRECK, LLP
Attorneys at Law
100 North City Parkway, Suite 1600
Las Vegas, Nevada 89106

f. On September 10, 2025, Defendant wrote a letter claiming "I spoke with Ron Wright, who confirmed that Dan Petersen misrepresented himself as a Board member to Menath and failed to disclose the aluminum wiring." Wright's deposition testimony directly contradicts this claim. Wright could not recall Mr. Petersen representing himself as a board member, does not recall asking Mr. Petersen about wiring, and testified that Menath already had information about CDL's wiring from its own historical data. Defendant's attribution of these statements to Wright is either a fabrication or a material distortion of what Wright actually said, further demonstrating that Defendant knew Defamatory Statement 2 was false when she made it.

g. Defendant, as the CDL board President who herself was dealing directly with Alliant to obtain insurance quotes, knew or should have known that obtaining a quote is fundamentally different from submitting an application for insurance.

As a result, Defendant made Defamatory Statement 2 knowing that it was false or, at minimum, with reckless disregard for whether it was true..

107. As a direct and proximate result of Defendant's slander, Mr. Petersen has suffered general damages, including harm to his reputation, physical harms, and emotional harms, as well as special damages in the form of medical bills for treating physical harms that the Defamatory Statement caused. Mr. Petersen is further entitled to an award of presumed damages, because the Defamatory Statement is slander per se since it accuses him of committing a felony, in an amount exceeding $75,000.

108. Defendant is further liable for all reasonably foreseeable republications of Defamatory Statement 2 by others, if any.

109. Defendant's conduct in making Defamatory Statement 2 was willful, wanton, and malicious and done with a conscious disregard for Mr. Petersen's rights. Defendant made Defamatory Statement 2 for retributive purposes, with an intent to harm Mr. Petersen, and with spite and ill will toward Mr. Petersen. Therefore, an award of punitive and exemplary damages,

BROWNSTEIN HYATT FARBER SCHRECK, LLP
Attorneys at Law
100 North City Parkway, Suite 1600
Las Vegas, Nevada 89106

BROWNSTEIN HYATT FARBER SCHRECK, LLP
Attorneys at Law
100 North City Parkway, Suite 1600
Las Vegas, Nevada 89106

subject to no statutory cap, against Defendant is both appropriate and necessary to afford Mr. Petersen complete relief.

**PRAYER FOR RELIEF**

**WHEREFORE**, Mr. Petersen prays for the following relief from this Court:

1. Compensatory and special damages, including presumed damages according to proof, in an amount to be proven at the time of trial, but not less than $1,000,000;
2. Punitive damages in an amount to be proven at the time of trial;
3. Costs of suit incurred;
4. An award of attorneys' fees in bringing this suit, to the extent permitted by substantive law; and
5. Such further and other relief as this Court might deem just and proper.

**DEMAND FOR JURY TRIAL**

Mr. Petersen demands a trial by jury on all claims, as to all issues so triable.

DATED: September 30, 2026.

BROWNSTEIN HYATT FARBER SCHRECK, LLP

BY: */s/ Travis F. Chance*
TRAVIS F. CHANCE, ESQ.
tchance@bhfs.com
SEAN S. CUFF, ESQ. (*pro hac vice*)
scuff@bhfs.com

*Attorneys for Plaintiff Daniel Petersen*

BROWNSTEIN HYATT FARBER SCHRECK, LLP
Attorneys at Law
100 North City Parkway, Suite 1600
Las Vegas, Nevada 89106

**CERTIFICATE OF SERVICE**

Pursuant to Fed.R.Civ.P.5(b), and Section IV of District of Nevada Electronic Filing Procedures, I certify that I am an employee of BROWNSTEIN HYATT FARBER SCHRECK, LLP, and that the foregoing **FIRST AMENDED COMPLAINT FOR LIBEL AND SLANDER PER SE AND DEMAND FOR JURY TRIAL** was filed and/or served via electronic service on the 30th day of September, 2026, through the Court's CM/ECF System, to the following:

Russell J. Carr, Esq.
HUTCHISON & STEFFEN, PLLC
100 W. Liberty Street, Suite 765
Reno, NV 89501
Email: rcarr@hutchlegal.com

*Attorneys for Defendant Kelly Mills Evers*

*/s/ Paula Kay*
an employee of Brownstein Hyatt Farber Schreck, LLP